UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| MELISSA JOHNSON, Personal Representative of the Estate of the late Timothy Johnson, <br><br> Plaintiff, <br><br> v. <br><br> WESLEY SHIFFLETT, <br><br> and <br><br> WILLIAM ARNEST, SCOTT COLWELL, <br><br> and <br><br> WILSON LEE, <br><br> Defendants. | Case #1:25-cv- 80 <br><br> SECOND AMENDED COMPLAINT |

Preliminary and Jurisdictional Statement

1. Defendant Wesley Shifflett, a Fairfax County police sergeant with a history of excessively rapid recourse to guns, shot and killed Timothy Johnson, who was running away from him after having stolen a pair of sunglasses from a Nordstrom's store in the Tyson's mall. Mr. Johnson, who had fallen to the ground, was unarmed and posed no danger to Sgt. Shifflett or anyone else. As a result of his shooting Mr. Johnson, Sgt. Shifflett was fired by the police for violation of department use of force policies and lack of candor in explaining how and why he shot Mr. Johnson. He was also criminally prosecuted for involuntary manslaughter and ultimately convicted of reckless handling of a firearm. His mother and personal representative of his estate now brings suit against Sgt. Shifflett and also against the persons who should have supervised him properly, given his existing record of recent excessive recourse to firearms when

dealing with persons suspected of non-violent offenses. This case arises under the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983. This Court has jurisdiction under 28 U.S.C. §1331 and also 28 U.S.C. §1332, plaintiff being a citizen of Maryland, all defendants being citizens of Virginia, and the matter in controversy exceeding $75,000 exclusive of interest and costs. The complaint also states claims under Virginia's Wrongful Death Act, Code of Va. §8.01-50 and under the common law of Virginia.

Parties[1]

2. Plaintiff Melissa Johnson is the mother of the late Timothy Johnson and the duly appointed administrator of his estate. Mr. Johnson, who was never married, is survived by three minor children, I.J., M.R. and S.S.

3. Defendant Wesley Shifflett is a former officer of the Fairfax County Police Department ("FCPD"). As a result of his shooting of Mr. Johnson he was fired by the police department and criminally convicted of reckless use of a firearm. He is sued in his individual capacity for damages. During all relevant times, defendant Shifflett was stationed at the McClean District Station, where he was ultimately assigned to the Tyson's Urban Team. The Tyson's Urban Team ("TUT") operates out of the Tyson's Corner Center shopping area and focuses primarily on shoplifting and security within the commercial area.[2] On February 11, 2023,

---

[1] Defendants do not retain the same police ranks they had at the times here at issue. For ease of reference, after each defendant's rank at the relevant time is stated, he will be referred to as "defendant [last name]."

[2] In a posting soliciting overtime work alongside the TUT unit, defendant Shifflett described retail theft as "the most common type of call that you will respond to on this assignment. . . TUT is involved in a high volume of foot pursuits and uses of force. This assignment can be a lot of fun, and we work together as a team to handle our cases."

eleven days before he shot Timothy Johnson, defendant Shifflett was promoted to the rank of sergeant.

 4. Defendants William Arnest, Scott Colwell, and Wilson Lee were each in supervisory capacities in relation to defendant Shifflett in the period January 2022-February 2023. From December 2021 until February 2023, defendant Arnest was a second lieutenant and defendant Shifflett's first-line supervisor at the McLean District Station. From August 2021 to January 2023, defendant Lee was the McClean District Station Commander, holding the rank of captain. Defendant Colwell was a first lieutenant and the McLean station's assistant commander from August 2021 to September 2022. As elaborated below, each knew or should have known of defendant Shifflett's repeated, reported and documented inappropriate recourse to his service weapon in the year preceding his killing Mr. Johnson. Each was in a position to take appropriate action to abate defendant Shifflett's notorious too-ready brandishing of his firearm at unarmed persons suspected, correctly or incorrectly, of non-violent petty offenses. Each could have cautioned or reprimanded defendant Shifflett, mandated additional training for him, caused him to undergo appropriate assessment for fitness of duty, or subjected him to appropriate discipline. But they did nothing. These defendants, known collectively herein as "the supervisory defendants," are sued in their individual capacities for damages for reckless failure to supervise defendant Shifflett.³

---

³When this suit was filed, Ms. Johnson lacked sufficient information to specify which supervisors failed to respond to defendant Shifflett's inappropriate recourse to his firearm. Having received, by court order, a list of twelve supervisors, counsel requested specification of those who had knowledge of the prior instances at issue. Defense counsel declined to provide such information, so all twelve of the identified supervisors were included as defendants in an amended complaint. The Court granted without prejudice the supervisory defendants' motion to dismiss, ECF 42, and a deposition took place in which this information was obtained. *See* ECF

<u>Claim for Relief</u>

<u>The Death of Timothy Johnson</u>

5. On or about February 22, 2023, Mr. Johnson stole a pair of sunglasses from the Nordstrom store in Tyson's Corner.

6. Defendant Shifflett was alerted to a suspected theft by store security. He and another officer responded to the store and followed Mr. Johnson as he proceed to run away from it. At all relevant times, defendant Shifflett did not know the value of the sunglasses Mr. Johnson was suspected of having stolen. Mr. Johnson was unarmed.

7. Defendant Shifflett pursued Mr. Johnson in a grossly negligent manner, in the dark into a one-acre patch of undeveloped land filled with trip hazards, thick underbrush and vines, on terrain that sloped and in which both defendant Shifflett and Mr. Johnson tripped and fell. The land was in a busy commercial area in close proximity to a parking garage, office buildings, and retail establishments where pedestrians, shoppers, office workers and bystanders could be at risk in the event of a shooting. Defendant Shifflett negligently and recklessly ignored a ready alternative, in the form of setting up a police perimeter to apprehend Mr. Johnson, a plan which was intended by other officers pursuing Mr. Johnson. At no time was there evidence that Mr. Johnson had committed a violent or assaultive act. For all defendant Shifflett knew, Mr. Johnson might have committed a petty larceny.

8. Once in the wooded area, defendant Shifflett shouted to Mr. Johnson: "Get on the ground." Mr. Johnson went to the ground, either because he did as directed or because he fell.

---

49. Having now secured the requisite information, Ms. Johnson brings claims against three of the original twelve supervisors, presenting facts sufficient to set forth the claim against each.

9. Once Mr. Johnson went to the ground, defendant Shifflett did not undertake to engage Mr. Johnson in any sort of de-escalatory dialogue. Other than shouting for Mr. Johnson to get on the ground, which Mr. Johnson did, defendant Shifflett took no steps to de-escalate the situation before shooting Mr. Johnson.

10. Defendant Shifflett then shot Mr. Johnson in the chest. Mr. Johnson, wounded and in pain, called for help. He was transported to the hospital, where he then died.

11. Defendant Shifflett has on different occasions stated to the police or in court that (a) he shot Mr. Johnson intentionally; (b) he shot him accidentally when he, Shifflett, tripped and fell; and (c) he cannot state with certainty if he fired at Mr. Johnson intentionally or accidentally.

12. At no time did Mr. Johnson have a weapon. Neither defendant Shifflett nor anyone else ever saw or claimed to have seen Mr. Johnson in possession of any weapon. Defendant Shifflett had no reason to believe Mr. Johnson was armed. No weapon was found in the area where Mr. Johnson was lying.

13. At the time defendant Shifflett shot Mr. Johnson, Mr. Johnson posed no threat to him or anyone else. Mr. Johnson was on the ground, weaponless, as defendant Shifflett and several police colleagues advanced toward him. He was unknown to defendant Shifflett. Defendant Shifflett never asked Mr. Johnson to put his hands. He never yelled "show me your hands" or "stop reaching" or the equivalent at Mr. Johnson before shooting him. After being shot, Mr. Johnson said "I had nothing."

14. In his subsequent interview by Police Internal Affairs, defendant Shifflett admitted he did not see any objects in Mr. Johnson's hands, and that there were no aggravating factors in his foot pursuit, which he styled "pretty standard." Other officers with whom he was

communicating by radio gave him no reason to think that Mr. Johnson presented a danger of violence, or that he had committed any crime other than the suspected larceny. What defendant Shifflett knew when he shot Mr. Johnson was that Mr. Johnson had stolen a pair of sunglasses of unknown value and had been running away from him.

15. Defendant Shifflett's shooting of Mr. Johnson was, and was found by the Fairfax County Police Department to have been, objectively unreasonable, in derogation of applicable police policies and long-settled constitutional principles under *Graham v. Connor,* 490 U.S. 386 (1989) and *Tennessee v. Garner,* 471 U.S. 1 (1985). He was also found not to have been candid in his responses to police interrogators as to how or why he shot Mr. Johnson. As a consequence, defendant Shifflett was fired by the police and subsequently prosecuted for involuntary manslaughter. Acquitted of that charge, he was convicted of reckless use of a firearm in connection with the death of Mr. Johnson. The statute under which he was convicted requires proof of the handling of a firearm "in a manner so gross, wanton, and culpable as to show a reckless disregard for human life and causes the serious bodily injury of another person resulting in permanent and significant impairment." Code of Va. § 18.2-56.1(A1).

The Failure to Supervise Defendant Shifflett

16. Prior to defendant Shifflett's shooting Mr. Johnson, on at least three occasions during the prior 12 months alone – including one twelve days before he shot Mr. Johnson – he had prematurely drawn his gun on an unarmed person thought to have been engaged in a non-violent offense:

(a)  On February 17, 2022, defendant Shifflett drew his gun on a man, believed to have stolen a pair of sunglasses, after chasing him on foot from a department store across a busy four-lane boulevard and into the parking lot of a local diner, where the man stopped running. Despite the fact that the suspect was no longer running and defendant Shifflett had no reason to believe him to be armed or dangerous, defendant Shifflett drew his gun, pointed it at him, and demanded he get on the ground.  He did so because, as he stated in his report, "people who commit crimes are sometimes armed."  The suspect was unarmed.  He was charged with three misdemeanors, all of which were subsequently *nolle prossed*.

(b) On October 25, 2022, defendant Shifflett drew his firearm twice on a fleeing shoplifting suspect. The first time, Officer Shifflett pointed his gun as the individual ran through a parking deck, claiming he saw the man reach towards his waistband. Defendant Shifflett wrote in his report: "I removed my firearm and pointed it at him not knowing if he was armed or not." As the pursuit continued, Shifflett again pointed his firearm after the man had stopped fleeing and was then standing inside the mall near a T-Mobile store. The man, who was unarmed, was charged and convicted in absentia of misdemeanor larceny.

(c)  On February 10, 2023, defendant Shifflett drew his gun on a woman sitting in a car suspected to be involved in a larceny scheme victimizing a Bloomingdale's store. In fact, as he wrote in his report, the woman "did not have any involvement in the Bloomingdale's larceny," and was released.  The woman, who was unarmed, was never charged with any crime.

<u>General Order 540</u>

17.  The Fairfax County Police Department's general order on the use of force, General Order 540, was amended in August 12, 2022.  Unless otherwise noted, the following provisions appear in the August 2022 version and its predecessor in 2022:

* Deadly force shall only be used against fleeing felons when the officer has 1) probable cause that the individual committed a violent felony, 2) that other means to effect an arrest have been exhausted, and 3) that felon's escape poses a significant threat of serious death or injury to the officer or others.

* Deadly force must never be used to apprehend a fleeing misdemeanant unless there is an imminent threat of serious physical harm or death to the officer or others.

* Officers should never point a firearm at someone unless they are ready to shoot that person.[4]

* Firearms (loaded or unloaded) shall not be aimed at any person except as necessary in the line of duty.[5]

* Firearms shall never be pointed in the direction of any individual unless objectively reasonable under the circumstances.[6]

18.  General Order 540 also mandates the following relative to documentation of pointed firearm incidents:

* Any pointing of a firearm to gain control or compliance shall be investigated and documented by the on-duty supervisor and sent to the appropriate commander for review and thereafter to division or bureau commanders.

* The officer must document the action and the surrounding circumstances and articulate the basis for such action in a clearly-worded incident report.

---

[4] General Order 540 (Effective March 1, 2021).

[5] General Order 540 (Effective March 1, 2021).

[6] General Order 540 (Effective August 12, 2022)

> \*       The supervisor must review the officer's documentation and ensure that it is completed properly.
>
> \*       The supervisor must create a record of the incident to be documented in the current internal affairs records management system.
>
> \*       Both officers and supervisors must avoid using boilerplate language in their reports, for example, merely citing "a general fear for their safety or fear of injury."
> \*       The supervisor's report must be forwarded to the appropriate commander for review, and thereafter to division and bureau commanders if necessary.
>
> \*       When a supervisor believes that an officer's pointing of firearm was not within policy, the supervisor shall promptly notify the commander of this finding.
>
> \*       Reviewing supervisors and commanders should question officers if they discover inconsistent or generic statements in their narratives.

<u>Defendant Shifflett's Culpable Supervisors</u>

<u>William Arnest</u>

19.  Defendant William Arnest was defendant Shifflett's first-line supervisor at the McClean District Station until defendant Shifflett's promotion to sergeant on February 11, 2023, eleven days before shooting Mr. Johnson.  During all relevant times defendant Arnest held the rank of second lieutenant.

20. The responsibilities of a second lieutenant with the FCPD include monitoring the activities of officers to ensure compliance with department policies and procedures; overseeing their investigative activities to ensure proper documentation and adherence to laws and departmental rules; scheduling and recommending training; reviewing subordinates' work for accuracy and procedural compliance; and providing performance management through counseling, written commendations or reprimands, and formal evaluations.         .

21. Together with other supervisors from TUT, defendant Arnest was responsible for supervising defendant Shifflett.  He would observe his work directly, read his investigative reports, watch his video footage, and document his uses of force. When defendant Shifflett pointed a firearm, defendant Arnest would review his incident report along with all relevant video footage, enter a pointed-firearm report on the internal affairs record management system, and forward the report to appropriate commanders for review.

22. As a first line supervisor, defendant Arnest had several tools at his disposal to address defendant Shifflett's conduct and performance relative to his premature recourse to firearms. These included recommending remedial training, conducting informal counseling, document deficiencies through substandard performance reports or formal evaluations, and issuing oral reprimands.

23. Defendant Arnest was defendant Shifflett's supervisor for the February 17, 2022 incident (*supra* ¶ 16(a)) and filled out the required use of force documentation.  In his report, he stated that defendant Shifflett pointed his gun while "19 to 21 feet" away from the suspect. This was untrue, and defendant Arnest knew it was untrue.  The body cam footage which defendant Arnest necessarily reviewed prior to completing his report shows officer Shifflett stooping over the suspect with his gun aimed directly at him.  *See* Exh. 1.[7]  Based on this misrepresentation, defendant Arnest wrongfully concluded that defendant Shifflett's pointing of the firearm had been "within policy."

---

[7]Exhibit 1is a still from another officer's bodycam footage, produced by the Fairfax County Police Department (FCPDPROD_1700) showing defendant Shifflett pointing his gun at the suspect on February 17, 2022.

24. Defendant Arnest was officer Shifflett's supervisor for the October 25, 2025 incident where defendant Shifflett inappropriately pulled a firearm on a suspected shoplifter. *See supra* ¶16(b). Again, defendant Arnest found officer Shifflett's actions to be "within policy," and forwarded the report to defendant Wilson Lee for final approval.

25. Defendant Arnest was present as officer Shifflett's first-line supervisor at the February 10, 2023 incident, where officer Shifflett pulled a gun on an unarmed civilian who was, in fact, uninvolved in and never charged with any crime. *See supra* ¶ 16(c). Defendant Arnest stated in his incident report that defendant Shifflett "approached [the civilian's] door with his gun out, faced down in a modified ready position.[8] But defendant Arnest's bodycam footage and his in-car video, both of which he reviewed before submitting the report, show defendant Shifflett pointing his gun directly at and inches away from the passenger in the car. *See* Exh. 2.[9] Based on defendant Arnest's report, commander-level review of the incident found contra-factually that "PFC Shifflett displayed his firearm and held it at the modified ready while giving command," and thus concluded that "PFC Shifflett's actions were consistent with department training and in compliance with General Order 540 Use of Force."

---

[8]General Order 540 (effective August 12, 2022) explains that a "modified ready" position is "a one or two-handed grip of a firearm held against the body with the muzzle pointed toward the ground, de-cocked, and the trigger finger straight along the frame. This position is ued when maneuvering near other officers or individuals, thereby preventing the inadvertent pointing of the firearm at a person while also maintaining a tactical advantage."

[9]Exhibit 2 is a still from defendant Arnest's bodycam footage, produced by the Fairfax County Police Department (FCPDPROD_1958), showing defendant Shifflett at the door of the car. Defendant Arnest's concession to this reality appears in his report where he muses that it is "possible" that when at the car door, defendant Shifflett's gun was "aimed in her direction." It was, in fact, demonstrably aimed right at her face, inches away.

Wilson Lee

26.  Defendant Wilson Lee was the McLean Station Commander from August 14, 2021, until January 28, 2023.  He was the station commander for most of the time that officer Shifflett was assigned to the station.  During the relevant time frame, he held the rank of captain.

27.  Defendant Lee was responsible for monitoring subordinates to ensure proper conduct and compliance with policies. He was also tasked with supporting patrol commanders by identifying deficiencies and recommending resources, training, or procedural changes. As a station commander, defendant Lee was tasked to follow up with defendant Shifflett's supervisor to ensure he had completed all required training, complete command review of use of force investigations or review completed by defendant Shifflett's supervisor, review his performance evaluations, and review the "early identification system" reports from the Internal Affairs bureau featuring officer Shifflett's uses of force.[10]

28.  As a station commander, defendant Lee had a broad range of remedial and disciplinary options to address officer Shifflett's ready recourse to firearms, including informal counseling, substandard performance documentation, requirement of remedial training, oral reprimands, and written reprimands. He also had the authority to escalate a reported firearm-pointing incident to Internal Affairs for a formal investigation. For less serious concerns, he could direct the first-line supervisor to conduct a review at the station level.

29.  Together with defendant Colwell, defendant Lee reviewed the documentation prepared by defendant Arnest regarding the February 17, 2022 incident in which officer Shifflett

---

[10]The Early Identification System, ("EIS") is described at ¶ 31, *infra*.

pointed his gun at a suspected shoplifter. *See supra* ¶ 16(a). The documentation was summarily and inappropriately approved.

30. Defendant Lee also conducted the command-level review of the October 25, 2022 incident. *See supra* ¶ 16(b). He summarily and inappropriately approved of defendant Arnests's documentation, making the determination that Shifflett's actions were objectively reasonable and consistent with department training and General Order 540.

31. The FCPD utilizes an Early Identification System ("EIS"), an Internal Affairs tracking tool designed to flag potential patterns of concern in officer conduct. The system generates quarterly reports identifying officers who meet certain predefined thresholds: four triggering events within a single quarter, or five within a six-month period. Once an officer reaches the threshold number of such events within a designated time frame, the EIS requires supervisory and command-level review to determine whether any intervention is warranted, such as counseling, retraining, or disciplinary action.

32. Internal Affairs issued an EIS alert regarding defendant Shifflett for the second, third, and fourth quarter of 2022, based on seven triggering incidents involving the use of force in the first six months of 2022 and five more in the third quarter alone. Defendant Lee was responsible for responding to the second and third-quarter alerts. In response, he submitted the required memoranda evaluating officer Shifflett's actions. Both of his responses stated: "I have reviewed each of the incidents and, based upon the following, deem no further action is necessary. . . A review of these incidents revealed no underlying concerns about PFC Shifflett's actions during the performance of his duties." Defendant Lee's review and approval represented the conclusory "boilerplate" language condemned by General Order 540 in derogation of his

obligation to do an independent review of the defendant Shifflett's excessive and dangerous actions.

### Scott Colwell

33. Defendant Colwell was the McLean Station Assistant Commander from August 14, 2021, until September 24, 2022, second in command to station commander Lee. Throughout the relevant time, defendant Colwell held the rank of first lieutenant.

34. Defendant Colwell was taxed to review reports submitted by first line supervisors, and to make sure officers were up to date on training. When an officer was involved in an incident involving the use of force or pointing of a firearm, defendant Colwell reviewed the supervisor's reports to make sure everything was documented properly. Defendant Colwell had the same range of remedial and disciplinary options as were available to defendant Lee, set forth in ¶28.

35. Defendant Colwell conducted the command-level review of defendant Arnest's report on the February 17, 2022 incident when officer Shifflett pointed his firearm at a suspected shoplifter (*supra* ¶ 16(a)). He reviewed both the investigative inquiry and body cam footage reviewed by defendant Arnest. Notwithstanding video footage contradicting defendant Arnest's representation that defendant Shifflett was 19 to 21feet away from the subject when he pointed his firearm at him (*see* ¶23, *supra*) , defendant Colwell signed off on this false report.

### The Supervisory Defendants' Defaults: Summary

36. In its section on administrative investigations, FCPD's Supervisors Manual explains that supervisors are responsible for taking immediate action to intervene when misconduct is observed or reported. The supervisor also is responsible for receiving complaints, notifying the appropriate chain of command regarding suspected violations, and initiating investigative inquiries or administrative investigations when necessary.

37. Despite the FCPD's use of force policies instructing that firearms should not be pointed at individuals if the officer is not prepared to shoot that individual (*supra* ¶ 17) the supervisory defendants all claim they had no concerns regarding defendant Shifflett's manifestly excessive recourse to his firearm in each of the antecedent cases in question (*see* ¶16).

38. The supervisory defendants knew of defendant Shifflett's known and documented all-too-ready recourse to his gun in cases involving unarmed and non-violent offenders, all in the year prior to his killing of Mr. Johnson. They knew or should have known that he posed a clear and present danger to persons he confronted, rightly or wrongly, for alleged criminal activity, specifically individuals suspected of shoplifting that he frenquently encountered due to his position on TUT. It is a commonplace that police-suspect confrontations are routinely fraught with danger and can lead to misguided split-second decisions that have disastrous consequences.

39. Given the supervisory defendants' awareness of defendant Shifflett's record of inappropriate recourse to his gun and of the danger this posed to the public, before defendant Shifflett shot Mr. Johnson they could have taken, and should have taken, supervisory action to cause him to be appropriately cautioned, or reprimanded, or trained, or monitored, if not subjected to assessment for fitness of duty or subjected to appropriate discipline. In reckless

disregard of the possible consequences of doing nothing, they took no such steps. Before the day he killed Mr. Johnson, defendant Shifflett was, in his own words, "never counseled, advised, corrected, disciplined or warned about anything having to do with use of any service weapon."

40.  The failure of the supervisory defendants to attend to the proper supervision of defendant Shifflett, with his known pattern of life-threatening brandishing of weapons at unarmed persons, manifested their deliberate indifference to his continuing to pose an unreasonable risk of severe, constitutionally cognizable, harm to others and possibly himself.

41.  The supervisory defendants' inactions in the face of the manifest dangers caused by defendant Shifflett's all-too-ready access to his gun constitute a proximate cause of Mr. Johnson's death at his hands.

Causes of Action

Count I: Defendant Shifflett

Fourth Amendment Violation: Unreasonable Force

42.  By his actions set forth at ¶¶5-15 above, defendant Shifflett violated Mr. Johnson's right to be free from unreasonable force, mandated by the Fourth Amendment of the Constitution.

Count II: Defendant Shifflett

Wrongful Death

43.  By his actions set forth at ¶¶5-15 above, defendant Shifflett caused the wrongful death of Mr. Johnson, giving rise to a claim under CODE OF VA. §8.01-50 on behalf of his statutory beneficiaries.

### Count III: Supervisory Defendants

### Fourth and Fourteenth Amendments Violation

44. By their actions and inactions set forth at ¶¶16-41 above, the supervisory defendants manifested deliberate indifference to defendant Shifflett's pattern of excessively aggressive recourse to his firearm, thereby posing an unreasonable risk of harm that ultimately caused the death of Mr. Johnson. In so doing, they violated their obligations under the Fourth and Fourteenth Amendments of the Constitution.

### Count IV: Alternative Count: Defendant Shifflett

### Gross Negligence

45. Should the evidence be found not to support a claim of intentional conduct by defendant Shifflett in killing Mr. Johnson, Ms. Johnson claims, in the alternative, that by his actions set forth in ¶¶5-15 above, defendant Shifflett engaged in grossly negligent conduct causing the death of Mr. Johnson.

***

Wherefore, Ms. Johnson seeks the following relief against defendant Shifflett and the supervisory defendants:

* Actual damages appropriate to the proof at trial, jointly and severally against all defendants,

* Punitive damages against each defendant appropriate to the proof at trial,

* Damages for Mr. Johnson's statutory beneficiaries under CODE OF VA. §80.1-50,

* Costs of suit, including reasonable attorney's fees, and

* Such other relief as is just.

Ms. Johnson requests trial by jury.

    Respectfully submitted,

    MELISSA JOHNSON, Personal Representative
     of the Estate of the late Timothy Johnson,

    By counsel

Dated:   June 26, 2025

Counsel for Plaintiff:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Abigail S. Grand, #100578
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100 / Fax: 703-684-1104
vmg@robinhoodesq.com
agrand@robinhoodesq.com
JohnsonTimothy\Pleadings\AmendedComplaint#2

//s// Carl L. Crews
Carl  L. Crews, #42691
C. Lowell Crews, PLLC
2776 S. Arlington Mill Drive, #186
Arlington, VA 22206
703.542.4473 / Fax 703.997.8735
legal@attorneycarlcrews.com

<u>Certificate of Service</u>

  I, Victor M. Glasberg, hereby certify that on this 26th day of June 2025, I electronically filed the foregoing Second Amended Complaint with the clerk's ECF filing system.

                <u>//s// Victor M. Glasberg</u>
                Victor M. Glasberg, #16184
                Victor M. Glasberg & Associates
                121 S. Columbus Street
                Alexandria, VA  22314
                703.684.1100 / Fax: 703.684.1104
                vmg@robinhoodesq.com

                Counsel for Plaintiff