UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

MELISSA JOHNSON, Personal Representative    )
  of the Estate of the late Timothy Johnson,    )
       )
     Plaintiff,    )
       )
v.    )   Case #1:25-cv- 80
       )
WESLEY SHIFFLETT, *et al.,*    )
       )
     Defendants.    )

_____

MEMORANDUM IN PARTIAL OPPOSITION TO
MOTION TO DISMISS OF SUPERVISORY DEFENDANTS

_____

Victor M. Glasberg, #16184
Abigail S. Grand, #100578
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100 / Fax: 703-684-1104
vmg@robinhoodesq.com
agrand@robinhoodesq.com

Counsel for Plaintiff

Table of Contents

The Complaint States a Supervisory Liability Claim Against Defendant Arnest . . . . . . . . . . . . 1

I.      The Dispositive Facts for Purposes of The Motion at Bar . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    Ms. Johnson Has Stated a Claim for Supervisory
        Liability Against Defendant Arnest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            A.  Defendant Arnest Knew of Defendant
                Shifflett's Risky Recourse to his Gun  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            B.  Defendant Arnest's Inaction in The Face of Sgt. Shifflett's
                Known Excesses Demonstrates Deliberate Indifference . . . . . . . . . . . . . . . 16

            C.  The Complaint Sufficiently Alleges Causality . . . . . . . . . . . . . . . . . . . . . . 17

IV.     Qualified Immunity is Unavailable to Defendant Arnest . . . . . . . . . . . . . . . . . . . . . . . 18

            A.  Defendant Arnest Mischaracterizes The Constitutional Offense At Issue  . . 19

            B.  *Nazario* Did Not Establish a New Rule Consequential Here . . . . . . . . . . . . 21

                1.  *Nazario* Did Not Address What Courts Had Earlier Held. . . . . . . . . . 22

                2.  Any Reasonable Officer Would Have Known That Shifflett's
                    Actions Were Excessive, And No More is Required. . . . . . . . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

The memorandum filed by the supervisory defendants has caused counsel for plaintiff Melissa Johnson to reconsider the merits of retaining Scott Colwell and Wilson Lee as defendants in this lawsuit. Better that wisdom come late than not at all. Ms. Johnson, by her counsel, stipulates to the dismissal of defendants Colwell and Lee, and in this memorandum opposes solely the dismissal of William Arnest on her claim of supervisory liability. Limiting the claim to defendant Arnest permits the pending motion to focus on his alleged liability alone, without submerging the discussion in a broader consideration of the claims against all three supervisory defendants named in the complaint of record.

## The Complaint States a Supervisory Liability Claim Against Defendant Arnest

### I. The Dispositive Facts for Purposes of The Motion at Bar

The motion to dismiss must be weighed against the following well-pleaded allegations in the complaint of record (ECF 56):[1]

1. Defendant Wesley Shifflett, a Fairfax County police sergeant with a history of excessively rapid recourse to guns, shot and killed Timothy Johnson, who was running away from him after having stolen a pair of sunglasses from a Nordstrom's store in the Tyson's mall. Mr. Johnson, who had fallen to the ground, was unarmed and posed no danger to Sgt. Shifflett or anyone else. As a result of his shooting Mr. Johnson, Sgt. Shifflett was fired by the police for violation of department use of force policies and lack of candor in explaining how and why he

---

[1]What follows tracks averments in the complaint, on a few occasions modestly and immaterially edited to exclude allegations irrelevant to the motion at bar and to account for the dismissal of defendants Lee and Colwell. The paragraph numbers track those in the complaint. All footnotes in this section appear in the complaint.

shot Mr. Johnson. He was also criminally prosecuted for involuntary manslaughter and convicted of reckless handling of a firearm.

4.  Defendant William Arnest was in a supervisory capacity in relation to defendant Shifflett in the period January 2022-February 2023.  From December 2021 until February 2023, defendant Arnest was a second lieutenant and defendant Shifflett's first-line supervisor at the McLean District Station.

5.  On or about February 22, 2023, Timothy Johnson stole a pair of sunglasses from the Nordstrom store in Tyson's Corner.

6. Defendant Shifflett responded to the store and followed Mr. Johnson as he proceed to run away from it.  At all relevant times, defendant Shifflett did not know the value of the sunglasses Mr. Johnson was suspected of having stolen.  Mr. Johnson was unarmed.

7.  Defendant Shifflett pursued Mr. Johnson in the dark into a one-acre patch of undeveloped land filled with trip hazards, thick underbrush and vines, on terrain that sloped and in which both defendant Shifflett and Mr. Johnson tripped and fell.  The land was in a busy commercial area in close proximity to a parking garage, office buildings, and retail establishments where pedestrians, shoppers, office workers and bystanders could be at risk in the event of a shooting.  Defendant Shifflett ignored a ready alternative, in the form of setting up a police perimeter to apprehend Mr. Johnson, a plan which was intended by other officers pursuing Mr. Johnson.  At no time was there evidence that Mr. Johnson had committed a violent or assaultive act.  For all defendant Shifflett knew, Mr. Johnson might have committed a petty larceny.

8.  Once in the wooded area, defendant Shifflett shouted to Mr. Johnson: "Get on the ground." Mr. Johnson went to the ground, either because he did as directed or because he fell.

9.  Once Mr. Johnson went to the ground, defendant Shifflett did not undertake to engage Mr. Johnson in any sort of de-escalatory dialogue.   Other than shouting for Mr. Johnson to get on the ground, which Mr. Johnson did, defendant Shifflett took no steps to de-escalate the situation before shooting Mr. Johnson.

10.  Defendant Shifflett then shot Mr. Johnson in the chest.  Mr. Johnson, wounded and in pain, called for help.  He was transported to the hospital, where he then died.

11.  Defendant Shifflett has on different occasions stated to the police or in court that (a) he shot Mr. Johnson intentionally; (b) he shot him accidentally when he, Shifflett, tripped and fell; and (c) he cannot state with certainty if he fired at Mr. Johnson intentionally or accidentally.

12.  At no time did Mr. Johnson have a weapon. Neither defendant Shifflett nor anyone else ever saw or claimed to have seen Mr. Johnson in possession of any weapon. Defendant Shifflett had no reason to believe Mr. Johnson was armed.  No weapon was found in the area where Mr. Johnson was lying.

13.  At the time defendant Shifflett shot Mr. Johnson, Mr. Johnson posed no threat to him or anyone else.  Mr. Johnson was on the ground, weaponless, as defendant Shifflett and several police colleagues advanced toward him.  He was unknown to defendant Shifflett.  Defendant Shifflett never asked Mr. Johnson to put his hands up. He never yelled "show me your hands" or "stop reaching" or the equivalent at Mr. Johnson before shooting him.  After being shot, Mr. Johnson said "I had nothing."

-3-

14.  In his subsequent interview by Police Internal Affairs, defendant Shifflett admitted he did not see any objects in Mr. Johnson's hands, and that there were no aggravating factors in his foot pursuit, which he styled "pretty standard."  Other officers with whom he was communicating by radio gave him no reason to think that Mr. Johnson presented a danger of violence, or that he had committed any crime other than the suspected larceny.  What defendant Shifflett knew when he shot Mr. Johnson was that Mr. Johnson had stolen a pair of sunglasses of unknown value and had been running away from him.

15.  Defendant Shifflett's shooting of Mr. Johnson was found by the Fairfax County Police Department to have been objectively unreasonable, in derogation of applicable police policies and long-settled constitutional principles under *Graham v. Connor,* 490 U.S. 386 (1989) and *Tennessee v. Garner,* 471 U.S. 1 (1985).  He was also found not to have been candid in his responses to police interrogators as to how or why he shot Mr. Johnson. As a consequence, defendant Shifflett was fired by the police and subsequently prosecuted for involuntary manslaughter.  Acquitted of that charge, he was convicted of reckless use of a firearm in connection with the death of Mr. Johnson.  The statute under which he was convicted requires proof of the handling of a firearm "in a manner so gross, wanton, and culpable as to show a reckless disregard for human life and causes the serious bodily injury of another person resulting in permanent and significant impairment."  Code of Va. §18.2-56.1(A1).

16.  Prior to defendant Shifflett's shooting Mr. Johnson, on at least three occasions during the prior 12 months alone – including one twelve days before he shot Mr. Johnson – he had prematurely drawn his gun on an unarmed person thought to have been engaged in a non-violent offense:

-4-

(a)  On February 17, 2022, defendant Shifflett drew his gun on a man, believed to have stolen a pair of sunglasses, after chasing him on foot from a department store across a busy four-lane boulevard and into the parking lot of a local diner, where the man stopped running. Despite the fact that the suspect was no longer running and defendant Shifflett had no reason to believe him to be armed or dangerous, defendant Shifflett drew his gun, pointed it at him, and demanded he get on the ground.  He did so because, as he stated in his report, "people who commit crimes are sometimes armed."  The suspect was unarmed.  He was charged with three misdemeanors, all of which were subsequently *nolle prossed*.

(b) On October 25, 2022, defendant Shifflett drew his firearm twice on a fleeing shoplifting suspect. The first time, Officer Shifflett pointed his gun as the individual ran through a parking deck, claiming he saw the man reach towards his waistband.  Defendant Shifflett wrote in his report: "I removed my firearm and pointed it at him not knowing if he was armed or not." As the pursuit continued, Shifflett again pointed his firearm after the man had stopped fleeing and was then standing inside the mall near a T-Mobile store. The man, who was unarmed, was charged and convicted in absentia of misdemeanor larceny.

(c)  On February 10, 2023, defendant Shifflett drew his gun on a woman sitting in a car suspected to be involved in a larceny scheme victimizing a Bloomingdale's store. In fact, as he wrote in his report, the woman "did not have any involvement in the Bloomingdale's larceny," and was released.  The woman, who was unarmed, was never charged with any crime.

17.   The Fairfax County Police Department's general order on the use of force, General Order 540, was amended in August 12, 2022.  Unless otherwise noted, the following provisions appear in the August 2022 version and its predecessor in 2022:

\*      Deadly force shall only be used against fleeing felons when the officer has 1) probable cause that the individual committed a violent felony, 2) that other means to effect an arrest have been exhausted, and 3) that felon's escape poses a significant threat of serious death or injury to the officer or others.

\*      Deadly force must never be used to apprehend a fleeing misdemeanant unless there is an imminent threat of serious physical harm or death to the officer or others.

\*      Officers should never point a firearm at someone unless they are ready to shoot that person.[2]

\*      Firearms (loaded or unloaded) shall not be aimed at any person except as necessary in the line of duty.[3]

\*      Firearms shall never be pointed in the direction of any individual unless objectively reasonable under the circumstances.[4]

18.  General Order 540 also mandates the following relative to documentation of pointed firearm incidents:

\*      Any pointing of a firearm to gain control or compliance shall be investigated and documented by the on-duty supervisor and sent to the appropriate commander for review and thereafter to division or bureau commanders.

---

[2]General Order 540 (Effective March 1, 2021).

[3]General Order 540 (Effective March 1, 2021).

[4]General Order 540 (Effective August 12, 2022)

* The officer must document the action and the surrounding circumstances and articulate the basis for such action in a clearly-worded incident report.

* The supervisor must review the officer's documentation and ensure that it is completed properly.

* The supervisor must create a record of the incident to be documented in the current internal affairs records management system.

* Both officers and supervisors must avoid using boilerplate language in their reports, for example, merely citing "a general fear for their safety or fear of injury."

* The supervisor's report must be forwarded to the appropriate commander for review, and thereafter to division and bureau commanders if necessary.

* When a supervisor believes that an officer's pointing of firearm was not within policy, the supervisor shall promptly notify the commander of this finding.

* Reviewing supervisors and commanders should question officers if they discover inconsistent or generic statements in their narratives.

19.  Defendant William Arnest was defendant Shifflett's first-line supervisor at the McLean District Station until defendant Shifflett's promotion to sergeant on February 11, 2023, eleven days before shooting Mr. Johnson.  During all relevant times defendant Arnest held the rank of second lieutenant.

20. The responsibilities of a second lieutenant with the FCPD include monitoring the activities of officers to ensure compliance with department policies and procedures; overseeing their investigative activities to ensure proper documentation and adherence to laws and

departmental rules; scheduling and recommending training; reviewing subordinates' work for accuracy and procedural compliance; and providing performance management through counseling, written commendations or reprimands, and formal evaluations.        .

21. Together with other supervisors from TUT, defendant Arnest was responsible for supervising defendant Shifflett.  He would observe his work directly, read his investigative reports, watch his video footage, and document his uses of force. When defendant Shifflett pointed a firearm, defendant Arnest would review his incident report along with all relevant video footage, enter a pointed-firearm report on the internal affairs record management system, and forward the report to appropriate commanders for review.

22. As a first line supervisor, defendant Arnest had several tools at his disposal to address defendant Shifflett's conduct and performance relative to his premature recourse to firearms. These included recommending remedial training, conducting informal counseling, document deficiencies through substandard performance reports or formal evaluations, and issuing oral reprimands.

23.  Defendant Arnest was defendant Shifflett's supervisor for the February 17, 2022 incident (*supra* ¶ 16(a)) and filled out the required use of force documentation.  In his report, he stated that defendant Shifflett pointed his gun while "19 to 21 feet" away from the suspect. This was untrue, and defendant Arnest knew it was untrue.  The body cam footage which defendant Arnest necessarily reviewed prior to completing his report shows officer Shifflett stooping over the suspect with his gun aimed directly at him. *See* Exh. 1.[5]  Based on this misrepresentation,

---

[5]Exhibit 1is a still from another officer's bodycam footage, produced by the Fairfax County Police Department (FCPDPROD_1700) showing defendant Shifflett pointing his gun at the suspect on February 17, 2022.

defendant Arnest wrongfully concluded that defendant Shifflett's pointing of the firearm had been "within policy."

24. Defendant Arnest was officer Shifflett's supervisor for the October 25, 2025 incident where defendant Shifflett inappropriately pulled a firearm on a suspected shoplifter. *See supra* ¶16(b). Again, defendant Arnest found officer Shifflett's actions to be "within policy, " and forwarded the report for final approval.

25. Defendant Arnest was present as officer Shifflett's first-line supervisor at the February 10, 2023 incident, where officer Shifflett pulled a gun on an unarmed civilian who was, in fact, uninvolved in and never charged with any crime. *See supra* ¶ 16(c). Defendant Arnest stated in his incident report that defendant Shifflett "approached [the civilian's] door with his gun out, faced down in a modified ready position.[6] But defendant Arnest's bodycam footage and his in-car video, both of which he reviewed before submitting the report, show defendant Shifflett pointing his gun directly at and inches away from the passenger in the car. *See* Exh. 2.[7] Based on defendant Arnest's report, commander-level review of the incident found contra-factually that "PFC Shifflett displayed his firearm and held it at the modified ready while giving

---

[6]General Order 540 (effective August 12, 2022) explains that a "modified ready" position is "a one or two-handed grip of a firearm held against the body with the muzzle pointed toward the ground, de-cocked, and the trigger finger straight along the frame. This position is used when maneuvering near other officers or individuals, thereby preventing the inadvertent pointing of the firearm at a person while also maintaining a tactical advantage."

[7]Exhibit 2 is a still from defendant Arnest's bodycam footage, produced by the Fairfax County Police Department (FCPDPROD_1958), showing defendant Shifflett at the door of the car. Defendant Arnest's concession to this reality appears in his report where he muses that it is "possible" that when at the car door, defendant Shifflett's gun was "aimed in her direction." It was, in fact, demonstrably aimed right at her face, inches away.

command," and thus concluded that "PFC Shifflett's actions were consistent with department training and in compliance with General Order 540 Use of Force."

36. In its section on administrative investigations, FCPD's Supervisors Manual explains that supervisors are responsible for taking immediate action to intervene when misconduct is observed or reported. The supervisor also is responsible for receiving complaints, notifying the appropriate chain of command regarding suspected violations, and initiating investigative inquiries or administrative investigations when necessary.

37. Despite the FCPD's use of force policies instructing that firearms should not be pointed at individuals if the officer is not prepared to shoot that individual (*supra* ¶ 17), defendants Arnest professed no concerns regarding defendant Shifflett's recourse to his firearm in each of the antecedent cases in question (*supra* ¶16).

38. Defendant Arnest knew of defendant Shifflett's known and documented recourse to his gun in cases involving unarmed and non-violent offenders, all in the year prior to his killing of Mr. Johnson. He knew or should have known that defendant Shifflett posed a clear and present danger to persons he confronted, rightly or wrongly, for alleged criminal activity, specifically individuals suspected of shoplifting that he frequently encountered due to his position on the Tysons Urban Team. It is a commonplace that police-suspect confrontations are routinely fraught with danger and can lead to misguided split-second decisions that have disastrous consequences.

39. Given defendant Arnest's awareness of defendant Shifflett's record of recourse to his gun and of the danger this posed to the public, before defendant Shifflett shot Mr. Johnson he could have taken, and should have taken, supervisory action to cause defendant Shifflett to be

appropriately cautioned, or reprimanded, or trained, or monitored, if not subjected to assessment for fitness of duty or subjected to appropriate discipline. In reckless disregard of the possible consequences of doing nothing, he took no such steps. Before the day defendant Shifflett killed Mr. Johnson, he was, in his own words, "never counseled, advised, corrected, disciplined or warned about anything having to do with use of any service weapon."

40. Defendant Arnest's failure to attend to the proper supervision of defendant Shifflett, with his known pattern of life-threatening brandishing of weapons at unarmed persons, manifested his deliberate indifference to defendant Shifflett's continuing to pose an unreasonable risk of severe, constitutionally cognizable, harm to others and possibly himself.

41. Defendant Arnest's inactions in the face of the manifest dangers caused by defendant Shifflett's ready access to his gun constitute a proximate cause of Mr. Johnson's death at defendant Shifflett's hands.

44. By his actions and inactions set forth above, defendant Arnest manifested deliberate indifference to defendant Shifflett's pattern of excessively aggressive recourse to his firearm, thereby posing an unreasonable risk of harm that ultimately caused the death of Mr. Johnson. In so doing, defendant Arnest violated his obligations under the Fourth and Fourteenth Amendments of the Constitution.


II. Standard of Review

To survive a motion to dismiss pursuant to Rule 12(b)(6), a federal plaintiff must "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff is not required to include "detailed factual allegations" in order to satisfy this

pleading standard. *Id*. at 555. A claim is plausible when it permits a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 570.  Where a motion to dismiss a civil rights claim is filed, the court must be "'especially solicitous' of the wrongs alleged." *Tennessee v. Murphy-Brown, L.L.C.*, 834 F. Supp. 2d 449, 454 (E.D. Va. 2011). Such a complaint should not be dismissed "unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Harbeck v. Smith,* 814 F.Supp.2d 608 (E.D. Va. 2011), citing *Harrison v. U.S. Postal Service*, 840 F.2d 1149, 1152 (4th Cir. 1988).

### III.  Ms. Johnson Has Stated a Claim for Supervisory Liability Against Defendant Arnest

Ms. Johnson's memorandum (ECF 27) opposing the motion to dismiss filed by the original supervisory defendants presents her view of the law before the Court when it dismissed, expressly without prejudice, her claims against those defendants, including defendant Arnest. ECH 42; *see also* ECF 49.  Ms. Johnson will review that law here, focusing squarely on defendant Arnest.

To establish supervisory liability, a plaintiff must demonstrate that: 1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct posing a "pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff, 2) the supervisor's response was so inadequate that it amounted to deliberate indifference or tacit authorization of the offensive practices, and 3) a causal link exists between the supervisor's inaction and the constitutional injury suffered.  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (denying summary judgment to supervisor who had knowledge of "at least three incidents in which [the

-12-

defendant officer] used excessive force which posed an unreasonable risk of harm to arrestees"). Supervisory liability in the civil rights context may extend "to the highest levels of state government." *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir. 1984).  Defendant Arnest contests Ms. Johnson's compliance with all three prongs of the test.

A.  Defendant Arnest Knew of Defendant
Shifflett's Risky Recourse to his Gun

As noted in the complaint, ¶38, "it is a commonplace that police-suspect confrontations are routinely fraught with danger and can lead to misguided split-second decisions that have disastrous consequences."  Guns are lethal weapons, which is why law enforcement officers are trained on when to use them and when not to use them.[8]

Ms. Johnson respectfully submits that defendant Arnest's repeated exposure to defendant Shifflett's inordinate recourse to his gun in addressing unarmed, non-violent shoplifters in the twelve months prior to his shooting Mr. Johnson, detailed in the complaint and set forth above at 4-11, *supra*, is dispositive of the question of whether he was aware of the life-threatening risks posed by his supervisee.  He was also aware of defendant Shifflett's reliance on subjective fear and speculation rather than objective particularized facts in deciding to draw his gun. This is apart from defendant Arnest's untruthful reporting of at least two of these incidents, thereby permitting the superior to whom his reports were submitted to find no fault with what defendant Shifflett had done.  His actions are a stark example of tacit supervisory minimization and approval of Shifflett's repeated resort to a lethal weapon directed at suspects posing no

---

[8]*See supra* at ¶17.  Ms. Johnson will present proof that defendant Shifflett was trained not to point a gun at a person he was not prepared to kill.

-13-

objectively reasonable threat of danger to anyone.

Having had repeated, documented knowledge of defendant Shifflett's aiming of his gun at unarmed, non-violent shoplifters in the year preceding his shooting Mr. Johnson, defendant Arnest was in a position to take appropriate action to attempt to forestall a foreseeable catastrophy, given what guns do and what people with guns can do.  He could have counseled defendant Shifflett.  He could have given him an oral reprimand or, if deemed appropriate, a substandard performance review.  He could have mandated additional training for him, or taken such other steps as were appropriate given departmental protocols.  He did nothing.  As averred in the complaint, ¶38, before defendant Shifflett killed Mr. Johnson, he was, in his own words, "never counseled, advised, corrected, disciplined or warned about anything having to do with use of any service weapon."  And then, having killed Mr. Johnson, he was fired from the police force for violating departmental use of force and honesty policies, and convicted of reckless use of a firearm.

In the case of defendant Arnest we are not dealing with constructive knowledge, which itself can be sufficient as a basis for supervisor liability. *Shaw* 13 F.3d at 799; *Woodson v. City of Richmond, Va.*, 88 F. Supp. 3d 551, 573 (E.D. Va. 2015); *Jones v. Murphy*, 470 F.Supp. 2d 537 (D. Md. 2007); *Garrett v. Commonwealth of Va.,* No. 3:20cv986, 2021 WL 3193176 at *5 (E.D. Va. Jul. 28, 2021).  We are dealing with actual, first-hand knowledge, compounded by falsification of reports so as to hide defendant Shifflett's excesses in the very documentation relative to use of guns mandated by the police department's general order 540 referenced in the

complaint at ¶¶23-25.[9]  The complaint at bar identifies three discrete incidents occurring within a twelve-month period prior to Mr. Johnson's death, all featuring Sgt. Shifflett, all involving the brandishing of a firearm at unarmed, non-violent suspected shoplifters, and all known to – and in at least two cases inaccurately minimized by – defendant Arnest.  *Cf. Shaw,* 13 F.3d at 799, 800 (sufficiency of three incidents of subordinate's misconduct).  Like the suspects in two of those cases, Mr. Johnson ran from the police after having shoplifted – or been thought to have shoplifted items of uncertain value from a Tyson's department store.   Like the suspects in those earlier incidents, he ended up on the wrong end of defendant Shifflett's gun. These materially identical incidents underscore a clear, ongoing pattern of Sgt. Shifflett's conduct that posed a "pervasive and unreasonable risk" of constitutional injury to citizens like Mr. Johnson, who ended up dead, because this time, whether intentionally or accidentally,[10] defendant Shifflett pulled the trigger.[11]

---

[9]Defendant Arnest's would have this Court ignore defendant Shifflett's violations of FCPD policies, arguing that such policies do not establish constitutional norms. While this is true, violations of departmental policies regarding use of force, bear upon the proportionality and reasonableness of an officer's response to a given set of circumstances. Evidence of violations of agency policies regarding guns, which can kill people, is plainly relevant to whether an officer's conduct created a known and unreasonable risk of constitutional harm.  In *Woodson*, 88 F. Supp. 3d at 575, a warden knew his deputies failed to conduct patrol checks mandated by prison policies and did nothing to address it, resulting in injury to plaintiff inmate from grossly excessive heat.  Denying summary judgment on a supervisory liability claim against the warden, the court, per Payne, J., wrote: "The record in this case allows for a finding. . . that Woody was aware of his deputies' failure to adhere to policy in such a manner as to evince deliberate indifference and failed to address this issue."  *Id.* at 575.

[10]Defendant Shifflett has claimed both at different times.  See complaint ¶11.

[11]: Defendant Arnest argues, at ECF 60 at 10: "Fourth Circuit precedent commands that the prior conduct of the subordinate must be unconstitutional before supervisory liability will attach," citing *Randall v. Prince George's Cnty*., 302 F.3d 188 (4th Cir. 2002) for this alleged rule.  The Fourth Circuit "commands no such thing.  The plaintiffs in [footnote continued] *Randall* failed to state a supervisory liability claim not because they did not present evidence of

B.  Defendant Arnest's Inaction in The Face of Sgt. Shifflett's
 Known Excesses Demonstrates Deliberate Indifference

Deliberate indifference can be established by pointing to a supervisor's "continued inaction" in response to known abuses by their subordinate. *Shaw*, 13 F.3d at 799; *Jones,* 470 F. Supp 2d at 546; *Slakan*, 737 F.2d at 373 ("A supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates").

Deliberate indifference can be inferred where the risk of constitutional harm is so evident that a failure to act is itself culpable. As the Supreme Court observed in *City of Canton v. Harris*:

> City policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could  properly be characterized as 'deliberate indifference' to constitutional rights.

489 U.S. 378, 390  n. 10 (1989).

In *Jones*, the plaintiff successfully established a prison warden's deliberate indifference by documenting his failure to take measures to address known excessive detention and strip-searching. 470 F. Supp. 2d at 546.  In *Garrett*, the plaintiff demonstrated deliberate indifference where prison supervisors "did nothing" to stop VDOC officers' inappropriate use of prison dogs. 2021 WL 3193176 at *5.  In *Woodson,* where the sheriff "knew of a pervasive

---

prior constitutional violations by the subordinates, but because they failed to present evidence of prior misconduct of any sort by the subordinates.  They conceded as much.  "Appellees concede that they did not present evidence of misconduct by [the supervisory defendant's] subordinates prior" to the events that gave rise to the case." *Id*. at 206.

pattern of incredibly risky behavior by his deputies" the court held a jury could find him deliberately indifferent because "instead of dealing with such behavior, it appears ... that [he] did nothing." 88 F. Supp. 3d at 575.

On at least three occasions in the year prior to the shooting Mr. Johnson, defendant Arnest had actual knowledge of Sgt. Shifflett's inappropriate recourse to his gun based on his fears and speculation in response to reports of non-violent, unarmed shoplifting. The third incident occurred only twelve days before his shooting of Timothy Johnson. In disregard of the manifest risk of constitutionally cognizable harm from disproportionate and excessive use of force defendant Shifflett posed to suspected non-violent shoplifters, defendant Arnest minimized defendant Shifflett's actions, misrepresented them in reports, and otherwise did nothing to control them, leaving defendant Shifflett to be fired and prosecuted thereafter for actions in violation of police orders and criminal law  –  and Mr. Johnson dead.

### C.  The Complaint Sufficiently Alleges Causality

The complaint alleges, at ¶22:

> As a first line supervisor, defendant Arnest had several tools at his disposal to address defendant Shifflett's conduct and performance relative to his premature recourse to firearms. These included recommending remedial training, conducting informal counseling, document deficiencies through substandard performance reports or formal evaluations, and issuing oral reprimands.

No one claims that defendant Arnest directed defendant Shifflett to shoot Mr. Thompson. No one claims that he was at defendant Shifflett's side when the shot was fired. The notion that the complaint of supervisory liability against him must fail because Ms. Thompson "did not allege any facts that would connect any action or inaction of [defendant Arnest] with the Johnson

-17-

incident," ECF 60 at 17 proves too much and is based on inapposite law.  It proves too much because on defendant Arnest's theory, there could be no supervisory liability predicated merely on a supervisor's recklessly tolerating a subordinate's misbehavior ultimately leading to a constitutionally catastrophe ultimately sued on.  But as reviewed at 13-15, *supra*, such liability exists.[12]  This defense is also based on inapposite law.  In *Carter v. Tatum*, 2023 WL 6797494 (E. D. Va. 2023), cited by defendant Arnest, an injured prisoner complained against a prison warden who, the prisoner alleged, "exercises authority, direction, and control" over the prison. *Id.* at *5.  In the court's words, the complaint "collapses into a simple identification of Defendant Tatum as the prison's warden."  *Id.*  The dismissal of the warden parallels the dismissal of the Fairfax Police Chief, whom Ms. Johnson has not undertaken to return to the lawsuit.[13]  As for *McWilliams v. Fairfax County Bd. Of Supervisors,* 72 F.3d 1191 (4th Cir. 1996), Ms. Johnson joins defendant Arnest in relying on its analysis: "Liability might be imposed upon the supervisor-defendants [] only by proof of their direct culpability in causing the injury either by directly authorizing it or *by expressly or tacitly condoning by inaction a known pattern of comparable coworker conduct." Id.* at 1197.[14] Causality has been sufficiently pleaded.

---

[12]And this is without regard to defendant Arnest's minimization and misrepresentation in official police reports of defendant Shifflett's gun-related behavior.  Complaint at ¶¶ 23, 25.

[13]The chief was sued as one of defendant Shifflett's supervisors when the county declined to identify his actual supervisors. Only defendant Shifflett's direct supervisor – defendant Arnest  – remains a defendant.

[14]*Williams,* in which Title VII relief was denied to a victim of same-sex harassment, was overruled on that point by *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).  The issue to which both parties here direct the Court remains settled law.

IV.  Qualified Immunity is Unavailable to Defendant Arnest

    A.  Defendant Arnest Mischaracterizes The Constitutional Offense At Issue

The availability of qualified immunity to defendant Arnest does not hinge, as he would have it, on whether case law prior to Mr. Johnson's death clearly established that pointing a gun at an unarmed person was unconstitutional.  Defendant Shifflett is not being sued because he pointed his gun at anyone.  He is being sued for wrongfully shooting and killing Timothy Johnson.  And defendant Arnest is being sued because he failed to abate defendant Shifflett's known and ongoing misconduct posing a foreseeable risk of the very constitutional injury that in the end befell Mr. Johnson.

Qualified immunity must be assessed in light of the constitutional violation alleged.  Here, the claim is of supervisory deliberate indifference to and tacit approval of a known pattern of conduct by a supervisee creating an unreasonable *risk* of a constitutional harm, here, the unwarranted killing of an unarmed man suspected of a nonviolent offense.

This type of harm was ruled unconstitutional forty years ago in *Tennessee v. Garner*, 471 U.S. 1 (1985), and defendant Arnest does not suggest otherwise.  Nor does he contend it was beyond the scope of his supervisory duties to take corrective steps to address a subordinate's repeated and disproportionate resort to pointing his service weapon at non-violent shoplifting suspects.  He does not  argue that defendant Shifflett's rationale for aiming his gun at unarmed, non-violent suspected shoplifters based on his subjective fear that "some shoplifters may be armed," (*supra* at 4-5 ¶16), comported with a standard of objective reasonableness,  *i.e.*, grounded in particularized facts that the suspect presented an immediate threat of serious injury

-19-

to himself or others.[15]  *See Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (reasonable suspicion requires that the officer "be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity") (cleaned up). Yet these are the dispositive considerations here, which defendant Arnest simply ignores..

Defendant Arnest argues, instead, that his failure to address Sgt. Shifflett's prior conduct should be immunized because, he contends, it had not yet been sufficiently judicially established that holding a non-violent, unarmed suspect at gunpoint may be unconstitutional.  With equal justice he could claim that, unless and until judicial precedent demonstrated otherwise, he would be entitled to qualified immunity in Ms. Johnson's case had defendant Shifflett deliberately fired his service weapon at each of these the antecedent unarmed, non-violent shoplifters – so long as he missed his target each time.  This reasoning misses the point that under settled law, at issue here is not disregard of *prior judicial declarations of constitutional harm* but disregard of the *foreseeable risk of constitutional harm*.[16]

---

[15]Defendant Arnest makes much of Ms. Johnson's candid concession that on October 25, 2022,  defendant Shifflett pointed his gun as a fleeing suspect allegedly reached towards his waistband. ECF 60 at 11.  Leaving aside that the suspect turned out to be unarmed (thus having no belligerent reason to "reach for his waistband") and that the appeal to "reaching for his waistband" is routinely mouthed as an unimpeachable rote exculpatory recitation, the complaint alleges, at ¶16(b), that defendant Shifflett *twice* pointed his gun at the suspect, the second time after the man had stopped fleeing and was then standing inside the mall near a T-Mobile store. Defendant Shifflett wrote in his report: "I removed my firearm and pointed it at him not knowing if he was armed or not." The man, who was unarmed, was  charged and convicted in absentia of misdemeanor larceny. See the complaint (and *supra*) at ¶16(b).

[16]Defendant Arnest's argument also turns a regrettable blind eye to violation of core Fourth Amendment protections of life and liberty.  Plaintiff notes that defendant Arnest has not undertaken to respond to the hypothetical presented in his earlier briefing, regarding a supervisor who is aware that an officer in his charge routinely drives recklessly, causing chaos but not death or injury but does nothing to correct the problem.  Since doing so has not been declared to be unconstitutional, will defendant Arnest contend that the supervisor will be protected by qualified

It was not until 2024 that the Fourth Circuit expressly confirmed what it, and district courts within its jurisdiction, had previously acknowledged as constitutionally actionable pointing of guns by law enforcement officers (*see* discussion at §B that follows) . *But at all relevant times, it was clearly established that law enforcement supervisors could not disregard the actions of personnel in their charge that posed a manifest risk of severe and undue  harm to others and thereby violate the latter's federal rights as well.*  "A supervisor who [is] clearly indifferent in the face of a pervasive and unreasonable risk of harm could be held liable under §1983 where the inaction bore an affirmative causal link to the harm suffered."  *Shaw*, 13 F.3d at 802.  "Well before this incident, this Court and others had acknowledged that the misconduct of frontline personnel could give rise to §1983 actions against their supervisors in certain circumstances." *Slakan v. Porter*, 737 F.2d 368, 377 (4th Cir. 1984).  This is what defendant Arnest is charged with, and why Ms. Johnson's claims against him should go forward.

### B.  *Nazario* Did Not Establish a New Rule Consequential Here

Defendant Arnest's insistence that prior to *Nazario v. Gutierrez*, 103 F.4th 213 (4th Cir. 2024) it was not established that an officer's pointing of a firearm could potentially violate the Fourth Amendment is overstated.[17] Doubtless, in *Nazario* the Fourth Circuit expressly confirmed

---

immunity were the officer recklessly to kill an innocent pedestrian?

[17] *Nazario's* ruling is more limited than defendant Arnest makes out, and bears only collaterally on the instant case.  In *Nazario*, the court held that: "*In these circumstances* —where the policemen had stopped a darkly tinted and large vehicle at night that was slow in pulling over — our law is not sufficiently developed to make it obvious that pointing their firearms at Lt. Nazario unconstitutionally prolonged his seizure."  *Id.* at 233 (emphasis added).  The instant case does not present the multiple hazards recognized to pose potential dangers to officers stopping drivers of vehicles. "Law enforcement officials literally risk their lives each time they approach

that holding a suspect at gunpoint in a traffic stop of a car with tinted windows could give rise to a Fourth Amendment violation.  But as will appear, this was not news of consequence to this case, for either defendant Shifflett or defendant Arnest.

### 1.  *Nazario* Did Not Address What Courts Had Earlier Held

In *Bellotte v. Edwards*, 629 F.3d 415, 418 (4th Cir. 2011), for example, officers entered the home of a person suspected of possession of child pornography.  Once inside, they came across the suspect's teenage son.  The son, who was not suspected of any wrongdoing, alleged that when the officers found him "walking out of his bedroom and talking on a cell phone," they "poked a gun at the back of his head."  *Id.* at 418.  Several members of the family, including the son, brought Fourth Amendment claims against the officers arising out of the allegedly excessive force. *Id.* at 419.  The Fourth Circuit dismissed these claims brought by the mother, who was believed to be armed, and the daughter, who was in an unsecured part of the house and held at gunpoint only for a moment.  As for the son's claim for excessive force, the defendants did not even plead qualified immunity, and the court permitted the claim to proceed.  *Id.* at 426.  *See*

---

occupied vehicles during the course of investigative traffic stops." *United States v. Stanfield*, 109 F/3d 976, 978 (4th Cir. 1997); *accord, Sharpe v. Winterville Police Dept,* 59 F.4th 674, 682 (4th Cir. 2023). The clarified law articulated by the court in *Nazario* did not address, nor did it create new law, for non-automobile incidents such as the stops here at issue.  (This is so even in the case of the wholly innocent passenger at whom defendant Shifflett pointed a gun after the driver had existed the car with his hands raised. If need be Ms. Johnson will move for leave to file a third amended complaint presenting defendant Arnest's own video of the event so demonstrating.) As will appear, the constitutional considerations governing non-vehicle events was settled long before Timothy Johnson was shot.  As for *Gunsay v. Mozayeni,* 695 Fed. Appx. 696 (4th Cir. 2017), the case on which defendant Arnest principally relies, there the court granted qualified immunity due not to the absence of clearly established precedent, but to the plaintiff's failure to identify any such precedent.  As now appears, Ms. Johnson does not make that mistake.

*also Samuels v. Nutter*, No. 3:15cv665, 2016 WL 1572933 at *2-3 (E.D. Va. Apr. 18, 2016),

where  an officer with his gun drawn approached a car being driven by a suspected drug dealer.

The suspect had not displayed any aggressive behavior.  Nevertheless the officer used his gun to

crack the driver's car window and held the driver at gunpoint.[18]  Citing *Graham v. Connor*, the

court, per Payne, J., held that the officer's actions, which did not include physical abuse,

shooting, or physical injury to the plaintiff, supported a claim for objectively unreasonable force

under the Fourth Amendment.[19]  These are not novel holdings; they parallel rulings of other

district courts within the Fourth Circuit; *see*, *e.g.*:  *Fulton v. Nisbet*, No. 2:15-cv-4355, 2017 WL

5054704 *__ (D. S.C. Nov. 1, 2017) ("While Defendant did not physically touch Plaintiff,

pointing a firearm at and threatening a person may in some circumstances be excessive force. . . .

There is not even a colorable argument that a reasonable state official would have been unaware

that it is unlawful to detain a person at gunpoint without probable cause"); *Magwood v. Fowler*,

No. 2:19-cv-2277, 2021 WL 3410482 at *5 (D.S.C. May 19, 2021) (where officer held man

suspected of minor crime at gunpoint for five minutes, "a jury could find that [his] actions were

not objectively reasonable and that [he] violated Plaintiff's Fourth Amendment rights.").

---

[18]The notion that brandishing a gun without sufficient justification can constitute a Fourth Amendment violation is not unique to the Fourth Circuit.  *See Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009); *Robinson v. Solano Cty.* 278 F.3d 1007, 1015-16 (9th Cir. 2002) (en banc); *Holland v. Harrington,* 268 F.3d 1179, 1192 (10th Cir. 2001); *Black v. Stephens,* 662 F.2d 181, 189 (3d. Cir. 1981); *Vanderhoef v. Dixon,* 938 F.3d 271, 279 (6th Cir. 2019); *Mlodzinski v. Lewis,* 648 F.3d 24, 37-38 (1st Cir. 2011).

[19]The defending officer did not even claim that there was no clearly established law to the effect that an officer could not strike at or break a car window with his gun or merely hold a suspect at gunpoint.  He argued in vain that absent physical injury, there was no claim.  *Id.* at *3.

2.  Any Reasonable Officer Would Have Known That Shifflett's
Actions Were Excessive, And No More is Required

"Qualified immunity attaches when an offic[er's] conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Kisela v. Hughes*, 584 U.S. 100, 104 (2018).  The touchstone for qualified immunity is "whether

the officer had fair notice that [his] conduct was unlawful."  *Id*. Defendant Arnest's insistence

that qualified immunity precludes his liability ignores the very case on which he principally

relies.  In *Nazario,* the Fourth Circuit observed: "The phrase 'clearly established' will include

"not only already specifically adjudicated rights, but those manifestly included within more

general applications of the core constitutional principle invoked." *Nazario* 103 F.4th at 231

(citing *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)).  A "robust consensus" of

persuasive authority may demonstrate the existence of a rule "that every reasonable official

would know," *id*., and there may on occasion be a "rare obvious case," where general

constitutional standards can clearly establish a right, "even though existing precedent does not

address similar circumstances." *Id*.   This assessment comports with guidance from the Supreme

Court, to the effect that "a general constitutional rule ... may apply with obvious clarity to the

specific conduct in question, even though the very action in question has not previously been

held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Taylor v. Riojas,* 592 U.S. 7

(2020) (constitutional rule identified in case law applicable to related conduct within scope of

rule with "obvious clarity.")  Indeed, some cases do not have exact predecessors because they

seldom arise.[20]  "Widespread compliance with a clearly apparent law may have prevented the

---

[20] "We face here an unfortunate exception to the truism that '[t]he easiest cases don't even
arise.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997). "The absence of 'a prior case directly

issue from previously being litigated." *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). Alas, defendant Arnest did not take any steps to secure his subordinate's "compliance with clearly apparent law" (to say nothing of minimizing and falsifying his misbehavior), with the result that defendant Shifflett's reckless and dangerous behavior finally got himself in trouble, and Timothy Johnson dead.

What is at issue here is defendant Arnest's knowing disregard of defendant Shfflett's repeated reckless aiming of a gun at an unarmed, non-violent shoplifter, triggered by defendant Shifflett's subjective non-particularized belief that "sometimes shoplifters are armed," and in the absence of objective evidence that the suspect was dangerous. Even a cursory application of long-settled Fourth Amendment principles governing defendant Shifflet's actions at issue highlights defendant Arnest's default in failing to take action to control this excessively risky behavior threatening constitutional harm.[21] One did not need to await the *Nazario* decision in 2024 to understand that "[p]ut simply, to point a firearm at a person is a threat with deadly force, and is therefore likely to instill fear, which could manifest into panic and a rash reaction." *Nazario,* 103 F.4th at 232. A police supervisor, like a line officer, is charged with knowledge that to pass constitutional muster, a use of force must be reasonable and proportionate to the circumstances, and that reliance on fear that "sometimes shoplifters are armed" as a justification for pointing a gun at an unknown suspect is a constitutional catastrophe waiting to happen, and

---

on all fours' here speaks not to the unsettledness of the law, but to the brashness of the conduct." *Bellotte v. Edwards*, 629 F.3d 415, 424 (4th Cir. 2011), quoting *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir.1995) (*en banc*).

[21] *See* n. 8 at 13, *supra.* As Fairfax police officers are directed: "Officers should never point a firearm at someone unless they are ready to shoot that person." ¶17 at 7 *supra;*

one which it is incumbent on a supervisor to control.  Defendant Arnest has not explained, because he cannot explain, why he should not have acted to control the highly risky behavior of an repeatedly using subjective beliefs instead of objective facts to justify aiming a gun at a non-threatening individual suspected of non-violent shoplifting.  His qualified immunity defense should be rejected.[22]

Conclusion

For these reasons, the claims against defendants Lee and Colwell may be dismissed by consent, and the motion to dismiss should be denied as to defendant Arnest.

Respectfully submitted,

MELISSA JOHNSON

By counsel

---

[22]Having focused on the merits of defendants' qualified immunity defense, Ms. Johnson concludes her brief by observing that it is for the Court to determine the procedural viability of defendant Arnest's renewed qualified immunity defense in the first place.  After the Court granted Ms. Johnson leave to amend her supervisory liability claims expressly *without* prejudice, defense counsel insisted in oral argument that those claims had to be dismissed *with* prejudice, as their factual basis well ante-dated the Fourth Circuit's decision in *Nazario,* and as a matter of law it was *Nazario* alone, counsel claimed, that could overcome qualified immunity.  (This was incorrect on the merits, but the point here at issue is solely procedural.)  Had the Court agreed that "it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged," *Harbeck*, 814 F.Supp.2d at 615, it could not properly have granted Ms. Johnson leave to file a necessarily futile amended claim of supervisory liability based on pre-*Nazario* behavior.  The Court, in short, did not accept defendant's insistence that qualified immunity *had to* prevail, any amendment notwithstanding, since no amendment could change the fact that the predicate facts supporting the claims at issue ante-dated *Nazario.* Ms. Johnson respectfully submits that this would appear to dispose of defendant Arnest's renewed – identical – argument appearing now (ECF 60 at 5-9).  Indeed, while that argument has not changed, Ms. Johnson's averments following discovery are far more inculpatory of defendant Arnest than they were when she was permitted to amend her claim. In short, defendant Arnest previously claimed absolute entitlement to qualified immunity, as a matter of law, from any claims based on conceded pre-*Nazario* supervisory failures, and this Court rejected that claim.  Why this is not law of the case subject to appellate review is unclear.

Dated:  July 30, 2025

Counsel for Plaintiff:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Abigail S. Grand, #100578
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100 / Fax: 703-684-1104
vmg@robinhoodesq.com
agrand@robinhoodesq.com
JohnsonTimothy\Drafts\2025-0724-OppSupervisoryDefMTD


//s// Carl L. Crews
Carl  L. Crews, #42691
C. Lowell Crews, PLLC
2776 S. Arlington Mill Drive, #186
Arlington, VA 22206
703.542.4473 / Fax 703.997.8735
legal@attorneycarlcrews.com

--------------------------------------------------------------------------------------------------------------
### Certificate of Service

I, Victor M. Glasberg, hereby certify that on this 30th day of July 2025, I electronically filed the foregoing Memorandum in Partial Opposition to Motion to Dismiss of Supervisory Defendants with the clerk's ECF filing system.

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

Counsel for Plaintiff

-27-